Case number 24-6193. Narragansett Indian Tribe acting by and through the Narragansett Indian Tribal Historic Preservation Office, Appellant, Mr. Sean McMaster, Administrator, Federal Highway Administration, et al. Ms. Walker for the appellant, Mr. Georgi for the appellate. Good morning. Ms. Walker. May it please the court. This case, this is an, is the application of the National Historic Preservation Act through what is referred to as the Section 106 process to protect tribal historic properties from harms caused by federal undertakings. In this case, it was an expansion of a highway bridge in Providence, Rhode Island over a very significant historic property of the appellant, the Narragansett Indian Tribe. I'm going to skip some of the background because you've been here a long time. That reminds me of one question from the record. The land is not tribal land, right? No, it's not in trust. It was a very significant tribal property, historic property, just some because when you study Indian law, you read a lot of history. That land in 1639 was a gift of the Narragansett Tribe to Roger Williams, who established Providence Settlement. Roger Williams was very friendly to the tribe. The state leaders today are not. Just a different time. The tribe's position is the lower court erred in finding that tribes have no role under the National Historic Preservation Act Section 106 process in the mitigation of adverse effects on significant tribal historic properties off reservation lands or lands not held in trust. I wish I could describe the 106 process as simple. It's not. It takes expertise and some understanding of the development of the tribal program under the lights come on, so to speak, and see the distinction in the tribe's roles in different aspects of the process of determining the impact on federal undertakings on historic sites. To break it down, first, on tribal trust lands, the tribe's Historic Preservation Office... You're jumping a little to the merits. Could you start with the issue preclusion question? This was already litigated, that argument. On appeal, what happened below was the court dismissed the claims against the government under the first programmatic agreement on the grounds that the federal government couldn't carry out the execution of that agreement because the state interfered. What's on appeal here is not subject to issue preclusion because it's about on the initiation of a new 106 process should the tribe have been excluded. This appeal is about the second programmatic agreement. Exactly. And the decision below said there was standing for the second programmatic agreement. Exactly. But there was a suit before that where the district court said there's not standing for the second programmatic agreement. Yes. Right? So why does that decision not preclude... No, the decision before that said not standing as to the first programmatic agreement, not the second. The first suit didn't have anything to do with the second programmatic agreement? Well, it does in the sense that they terminated the first programmatic agreement and initiated the second, but the state didn't interfere with the second because the state had been dismissed. And the state had been dismissed because their mitigation... I guess what I'll say is when your friend from the U.S. Attorney's office is there, I'm going to ask him to look at the complaint in the first case and point to where the complaint raised issues related to the second programmatic agreement. And if he can do that, I'm going to ask you why you still think that first case didn't have anything to do with the second programmatic agreement. Well, yeah, the first case involved mitigation properties that the state had control over as part of the mitigation of the project. And all parties, the state of Rhode Island Department of Transportation, the Federal Highways, and the tribe signed off that those properties that the state controlled would be mitigation measures, right? And then those properties weren't. And so the second agreement didn't involve those properties. And so the second agreement was about between Federal Highways and the tribe. And I'm happy to be correct. I thought that part of the government's argument was that your first suit said the second programmatic agreement was arbitrary and capricious. And this district court said you don't have standing to raise that. No. That could be totally off. He'll tell me if he thinks I am, and you can respond. I thought the nature of the discrepancy was that in the first case, it was about the second programmatic agreement, but there was no standing as to substantive injuries, harm to particular land or the loss of benefits of the land transfers. But the court explicitly carved out and said, I'm not talking about procedural claims. And this current case is about procedural injury, failure to consult.  And that's the difference between the two. Yeah. Well, we argued when he gave us, he dismissed without prejudice and allowed us to re-argue the standing part. We argued procedural injuries. So you're correct. So that's why it's not precluded by the first ruling. This is addressing a different thing. You did not argue procedural standing in the first one? No. Well, if he can show me where he thinks you did, then you can respond. Yeah. And this motion even apply to the cases dismissed without prejudice? We don't think it does. The dismissal without prejudice and adjudication on the merits? No, they're allowing us. Yeah. That answers your question. Well, I'm not sure that all of our precedents. Yeah, I know. This is a long history on this case. I know I'm growing old doing it. I have a factual question about the history. I understand that the tribes were happy with the first programmatic agreement, which gave them control over certain land, et cetera. And then there was a change where you still could have had the land, but the deal was they wanted you to give up sovereign immunity with respect to deeds or something. And I'm wondering why didn't you take that deal? I guess you had two opportunities to take that deal. Well, right. And it can look like the tribe was being, you know, sovereign. But what happened was when they negotiated that the tribes would be the conservators of these two properties, the land would not be in trust. And it had environmental, I mean, protection covenants in the agreement. And everybody signed off. And there was no need to have a waiver of sovereign immunity because in the agreement, if the tribe breached those conservation covenants, the plan would revert to the federal government, not in trust for the tribe. So the tribe would lose all rights. And I think the state believed that if they didn't waive their sovereign immunity, the tribe somehow would get those lands in trust, in Indian trust. But the Bureau of Indian Affairs, and you'll take my testimony on it, they won't take land in trust that have those kind of covenants on it. So it wouldn't have cost the tribes anything to just to agree to waive the sovereign immunity because they didn't think they had a right to that land anyway. So why didn't they? No, no. The sovereign immunity, there was, it's a waiver of their standing as a national recognized tribe, that they have, their immunity is to protect their tribal assets. So they don't get arbitrarily- But I thought it was a waiver only with respect to this agreement and the covenants within the agreement. And it sounds like they didn't think they were entitled to that land anyway. So I don't understand why they didn't- No, they were entitled to be the conservatives over that land. So they felt that the state was being unreasonable. See, they already executed agreement where the waiver was not part of the agreement. And the General Council for Federal Highways argued with the state and said, that waiver is not needed. The Board of Advisory Council on Historic Preservation said to the state, that waiver is not needed. And so I think the tribe felt the state was way overreaching. And so then later, just so you know, the history is when they got into the arguments over the second programmatic agreement, the tribe offered that, said, well, let's get back to those covenants. Maybe we can do that. Rejected by federal- I thought I read that it was offered to them again and the tribe- No, no. The tribe came forward and said, we will talk about that. We will put that in. And by that point, the federal government had excluded the tribe as a consulting party and refused to consider it. That's the record. Okay, thank you. But at that point, see, the reason they refused it is because they weren't going to go back to those mitigation properties because the state was refusing to do it regardless. The state refused. What the state wanted at that point of the negotiation, it was a negotiation between federal highways and the state, is all they were willing to do was to give the tribe a video of its history, a documentary history, and training in 106 process, which the person that taught me all of this, the tribal historic preservation officer, was there at the beginning of the National Historic Preservation Act, at the beginning of the tribal program, and he really didn't need 106 training. So it was not- Well, I think that was where they started, and maybe an unfortunate starting point, but then the highway administration did offer some other things and did, I thought, offered two of the pieces of land, or at least guarantees of access for the tribe. They still don't have access to that land. Well, it's because the tribe didn't agree to the offer. Well, I don't think the tribe- It was offered, and then to protect your rights of access, and the tribe rejected that. Am I correct on that? No, they never- they were supposed to have the management agreement of those properties when they first offered it. Wait, wait, if you're talking about the first programmatic agreement- No, no, yeah, but those properties, that's your- Well, I'm sorry. So let's forget everything that happened under the first programmatic agreement. Pretend time started when they made the first offer under the second programmatic agreement, the proposed terms for a programmatic agreement. And the first thing they offered for mitigation was the stuff you talked about, the training and stuff, and the tribe understandably said no. And then my understanding is that they came back and were offering, was it joint ownership or joint control over at least maybe two of the territories, two properties? One property was going to be joined on, but in the second agreement is what happened when they got to that point of the second agreement. The tribe was not a consulting party. I got all that. I'm just trying to ask you what the- the first mitigation proposal was rejected by the tribe, and then the highway administration came back with another one, and that one involved the properties. I can't remember if it was joint, maybe not joint ownership, but there was certainly guarantees of access for the tribe, and it also was rejected. Well- Correct? No. When they came back- What did they come back with? They came back with no properties because the state controlled the properties.  You're not going to be able to- States would not- What did they come back with? Not what they- They came back with, they would mitigate this with a video of the tribe's history, an academic document- No, you rejected that one. They came back with other offers after that. No, that's what they got. That was the agreement that was signed, the second programmatic agreement. I'm not making this up. What was signed by the state of Rhode Island and federal highways on the second programmatic agreement was, nope, the state was the conservator over the properties. The tribe had no role in it, and they got a video. This is in the court's opinion. They got a video, they got a documentary history, and they got 106 process training. They got nothing. They didn't get anything else. I understand that the state offered a compromise of all three parcels in joint ownership. Not on the second programmatic. Spring of 2019. I'd have to see that number. Well, anyhow, you can look at that. The state never came back and said that they could be the conservators of those properties. I'm not saying what they said. They offered joint ownership. No, no. That was not a- No. I look at the record, it's not going to be there. No. Oh, I can-  Yeah. If the district court dismisses for lack of standing, and doesn't expressly say whether the dismissal is with prejudice or without prejudice, what is it? No, no. The district court dismissed without prejudice, so the plaintiffs- I'm saying in general, if a district court dismisses for lack of standing, and it doesn't expressly say with prejudice or without prejudice, what's the default? Well, the default here was- Here, in general. Well, I don't know if I can answer that, because I think it kind of has to be in context. I'm not trying to be difficult. Isn't the default rule that if something is dismissed, and they don't specify with or without prejudice, that it's with prejudice? Right. I think that's the default rule. Yeah. I guess theoretically, if you're dismissed without standing, you could come back with additional affidavits or something, if it were without prejudice. But here, the court was- the opinion, when they dismissed without prejudice, they were very specific that the plaintiffs could go forward with the agreed- Procedural, in this case, I understand. Yeah. Does that answer you? I don't want to- It does. I mean, we have precedents where the district court dismisses for lack of standing, then that same party brings same suit, and the district court says, issue preclusion prevents me from finding that you have standing here. And your argument for- your argument at the beginning of our conversation was that if it's dismissed for standing, it's just always dismissed without- or rather, your argument- No, no, no. No, what I'm saying is, from our perspective, when it was dismissed without prejudice for the second programmatic agreement, it made things easier for us because we could go forward on the second, which was a totally new initiation of a whole new 106 process. It wasn't a continuation of the first 106 process. It was a whole new initiation of a new process. Made it easier for us to go forward on that. And when we did- I inherited that complaint. I don't want to give excuses, but there was a complaint in the lower- in the courts in Rhode Island that came forward. And the court, when they granted removal of the case into D.C., they said it's ripe for summary judgment. I thought he had found standing. I was wrong. And so then when he dismissed for not having elaborated on our grounds for standing enough and putting in enough factual, we repled it to go after the new 106 process on the second programmatic agreement. And that made it much easier for us because that's what we are- It was on a different legal theory about consultation. Yeah. Yeah. I know it's complicated. I was trying not to get you in the weeds too deeply because we've briefed a lot of this. But I wanted to- Sorry, you're way over your time here. No, I want to get into the key issue, which is did- we feel the judge erred in failing to make the tribe a consulting party because this was off-reservation land. That's a misinterpretation of the rules. That's the argument I want to get to. And I can do it quick. Do you have any- Excuse me, you're over your time here. And so- Seven minutes. It's going up now. The red means you're over your 10 minutes. Oh, I'm sorry. I'm sitting there. I was not following you. You don't want me to get to the one- You have- Okay, let me finish talking here. Do you have- I will give you two minutes. But we have your argument from your brief. So if there's something more you want to add on from your briefs, then please, I'll give you two minutes on this merit. After they are right- I'll also give you rebuttal too. But just right now, you can take two minutes to make this your key point. But again, we do have your brief. So there's no reason to repeat that. I know. But let me just summarize it. I appreciate the time. But again, I understand why the court below got caught up in the regulations and trying to understand this consulting party distinction. I think the government confused the court equating consultation as equivalent to being in a consulting party role. And in the rules, and this is in 800.2, and they have, what is a consulting party? When it's a tribe, what is a consulting party? And they said there's two times of tribes a consulting party. One when it's on tribal land. And then they talk about when it's on land significant, historically significant to the tribe. And then it refers when they- and this comes about not in every stage of the consultation. It comes about once the parties agree that there's been adverse effects. And if there's adverse effects, do there need to be mitigation of those adverse effects? And once it's agreed by the party, there needs to be mitigation. That's when off tribal land, the tribe comes into a consulting party rule and they apply the MOU rules of section 800.6 that says the consulting party, the tribal consulting party is a signatory. And proof in the pudding is Federal Highways has done this with this tribe before. On other mitigation agreements, I have that as my exhibit A. One in the city of work and once on the same highway project. And they mitigated it by, you know, one was improving the roof on a tribal longhouse. And another, you know, they actually gave them properties to conserve like they were doing here. So that's the- I don't want to wear you out. But we feel that court- We're not getting worn out here. Yeah, I know. Well, I'm just saying that's where the court misinterpreted the rules. Yeah, I think we understand. You made the legal argument in your- Yeah, I appreciate your time. Yeah, and we'll give you some time to rebuttal. Yeah, thank you. Good afternoon. Good afternoon, Your Honors. May it please the court, Demetre Georgia for the United States. Judge Walker, I'll jump right into answering your original question about the differences between- or lack thereof, rather, between the previous judgment decision to dismiss the previous case from the district court and the opinion below that is before this court. The way that the district court phrased its understanding of the complaint in the previous case appears, and we actually cite this on page 15 in our brief, and it states that Denari Ganson claimed that terminating the original programmatic agreement, that is the 2011 programmatic agreement, and dictating new proposed mitigation items, items that the tribe was never consulted about, is arbitrary and capricious. That is from the original case. So those- in that case, the district court found it does not have subject matter jurisdiction. We submit that the 2019 programmatic agreement was currently before the court because the tribe praised it, and the court found that it lacks subject matter jurisdiction, and therefore, it's been- Judge Walker's argument in response is that that first district court decision was a dismissal for lack of standing. It was a dismissal without prejudice, and that there's a kind of bright line rule that dismissals without prejudice don't have preclusive effect. Two responses to your honor. First, the- that dismissal actually invited the tribe to amend its complaint, and so it could have done so to address the concerns that the district court had about subject matter jurisdiction. The tribe did not decide to do that. Rather, the tribe decided to file a new complaint, file a new case, and so we think that that- So it amended it a lot. I'm sorry, your honor. It amended it a lot. It amended it to the extent that it addressed some of the concerns that the district court had. However, under this court's precedence under homebuilders, it doesn't satisfy the curable defect exception in the sense that the new facts that it brought into the complaint already existed at the time that the original- Homebuilders. I just went back to double check. The first- the district court's first decision to dismiss for lack of standing in homebuilders did not specify with or without prejudice.  And so Judge Pan suggested that that implies it was dismissed with prejudice. That would be my understanding of this court's precedence. Whereas here, the district court's first dismissal was a dismissal without prejudice. So I guess, do you have any precedent where a court found issue preclusion in the case before the court based on a previous decision where the dismissal was for lack of standing and the dismissal was without prejudice? The question of issue preclusion was actually not before the court. In this case, the low. So this is- I'm saying, do you have a preferably a D.C. circuit case where you say, yes, there's issue preclusion here based on a previous suit that was dismissed without prejudice? Where that specific fact was what was outcome determinative, I don't have a specific site. However, under this court's- Do you have any case where we applied race judicata or issue preclusion to a jurisdictional dismissal without prejudice? So that is- begins with Dozier v. Ford Motor Company, and it continues with Gap Company as well as most recently HomeBuilders. Those were dismissals- Okay. Sorry, maybe I didn't say it right. A dismissal for lack of jurisdiction without prejudice. Now, you just said HomeBuilders was with prejudice or the court was silent. I'm actually not sure whether the original dismissal in HomeBuilders was with or without prejudice. Okay. So then- I'm telling you it was unspecified. It was unspecified. Okay. So do we even- Judge Payne said that means with prejudice. Yes. And do we even need to reach this issue? Because even if we assume that you could assert issue preclusion, it wouldn't be precluded in this case because the previous dismissal, whether it was or without prejudice, was for a different reason. So in that case, even if you assume that you could theoretically or not assert issue preclusion for something that was dismissed without prejudice, in this case, if we assume it were true, it wouldn't apply because on the merits, it doesn't meet the test because the first dismissal was for a different reason. It was because of alleged substantive injuries. And it expressly left open the idea that you could amend to assert procedural claims. And instead of amending, they just filed a new case that asserted procedural claims. It just seems like under the particular facts of this case, maybe we don't need to reach that technical question about whether the first dismissal was with or without prejudice. I think that's right, Judge Payne. And moreover, I think the case would be different if there were facts alleged that occurred subsequent to the dismissal. That is not the case here. The only thing that the new complaint did was we assert new facts or elaborate on facts that already existed at the time of the original dismissal, which under homebuilder puts it squarely within homebuilders. And therefore, the court can rely on homebuilders and apply issue preclusion. I think what we're trying to ask is you're invoking not issue preclusion, but a curable defect doctrine. And that is I'm not aware of that being applied in cases that are dismissed for jurisdictional reasons without prejudice. And it didn't sound like you were either. If someone keeps filing the exact same complaint with the same allegations, the same standing argument, and it gets dismissed, and then they add one new fact each time or something, that's a different story from what was going on here. I guess I don't understand your question. Okay. My first question is, it sounds like you don't have any authority for this principle that when you have a jurisdictional dismissal without prejudice, that the party can only replete brand new facts. That comes from a different doctrine, a curable defect doctrine. Correct. And that is homebuilders dozier and then the progeny of dozier. Right. Okay. But that's a different doctrine. Right. You don't have any application of that doctrine. To dismissal for jurisdictional reasons without prejudice. People replete to add facts like a diversity case, and they got the amount of money wrong, and then they can replete it with the right amount of money. Actually, that's dozier. And that's precluded under dozier. If they knew it, or you can have a change in law. Right. And someone has to add new facts because of a change in law. But again, I'm talking about a dismissal without prejudice, which is not cases you're citing. Even if the court declines to apply issue preclusion and looks at standing directly, the tribe doesn't have standing to bring this particular case. Did you raise issue preclusion before the district court? It was not argued before the district court. It was included in the answer. Right. Okay. I remember that now. Thank you. And even if the court doesn't apply issue preclusion, but reviews the tribe still lack standing, particularly what the tribe has asserted is that vacature of the 2019 programmatic agreement would lead to a new process that necessarily would lead to some alternative measures. The only three alternative measures that the tribe has put forward relate to the acts of a third party that is not before the court, and that is the state of Rhode Island. They've asserted that the state of Rhode Island can still transfer the properties to the tribe. Very much objecting to the amount of consultation process received from the Federal Highway Administration. They're very much objecting to that. Right. And the question... That's not something Rhode Island is in charge of delivering. That's something the Federal Highway Administration is in charge of delivering. The act is an act that guarantees process. It doesn't guarantee outcome. Okay. That's a fair argument, right? Yes. Yes. What the tribe has identified as three possible outcomes of that consultative process is that they can obtain the three properties that were issued in the 2011 programmatic agreement, that the federal government can essentially write a check, provide them with funds, and for the tribe to come with some sort of mitigation on its own or some other unspecified mitigation. For Rhode Island to transfer properties, necessarily that is an act of Rhode Island. And the federal government has attempted numerous times to compel Rhode Island to adhere by the 2011 programmatic agreement. However, Rhode Island refused to do so. And there's no evidence in the record that the tribe in Rhode Island can come to some sort of mutual agreement to transfer properties from Rhode Island to the tribe. The Highway Administration here, when it put aside the whole first programmatic agreement, going back to the drawing board and starting now with the second programmatic agreement, it opened by sending an email to the tribe that says, here's what we propose for mitigation. And it was, y'all need training, we'll have a little historic program. Pretty pathetic. And the tribe felt insulting. Not an unreasonable response. Did you, why did you not have an obligation before throwing out to them, here's what we're going to do for mitigation? Talk to them before you made any mitigation proposal. Isn't that what the consultation, I'm not saying whether you had to agree with what they're proposing or not, but it seems like you sort of set them out, here's what we're offering before talking to them. And then you said react to what we're proposing. Does a consultation process require you to talk to them first? The consultation process requires the solicitation of the tribe's views. It is, there are actually four stages throughout the process that are outlined in the regulations. Here, we're only talking about mitigations. This was an initial... Before you propose mitigations? It is, whether the agency or the state or the tribe first proposes mitigations, that is an initial proposal. And that's actually what happened. And I would like to... Very specific question. It was... Before the June 28, 2018 email that said, we're starting over, we're starting from scratch, new agreement, and here's what we propose for mitigation. Was the tribe consulted before you formulated those proposals for mitigation? So, the tribe had been engaged continuously for numerous years. I understand that was all in the first programmatic agreement. Did you consult with them about the mitigation that was proposed in the June, 2018 email? The record doesn't indicate whether the agency directly engaged with the tribe on those specific proposals before June, 2018. However, the agency did engage with the tribe and listen to the tribe's inputs afterwards. I don't know. I'm just asking. Okay, so let's take... So, the record doesn't... No evidence that you consulted with them before the June, 2018 email. Correct. Which was the, here's what we're going to do for mitigation now. Does the consultation requirement at this stage, the mitigation stage, require you to talk to them before you start putting pen to paper and settling yourselves on particular ideas about what you think the mitigation should be? I... The regulations do not specify exactly at which point in which email, before which email. I was going to say, if you can just tell me if this is a practice. I don't know. Do you routinely do this? Do you say, here's what we think is good mitigation, react? Or do you usually... I had thought the government usually talked to the tribe, and maybe other interested parties too, but we're only just talking about tribe here for this, talk to the tribe before proposing mitigation efforts. That was the usual practice. So... Is that the usual practice? I am not familiar with every single instance, however... Okay, I'm not asking every single interest. I'm asking the usual practice, which could be exceptions, but is that the usual practice? I apologize, I don't know. I'm not sure it's exactly at what point, whether... Isn't that kind of important here? I mean, if it's a consultation, right? And at least it sounds to me, but I might be misreading the regulations here, that maybe the most important stage is to talk to them before people start locking into certain ideas of mitigation. I think what your honor is assuming that that proposal is what ended up in the final agreement, which is what... No, no, no. That's not my assumption. My assumption is that... And none of this is criticizing what the highway administration did with respect to the first programmatic agreement. Sounds very frustrating, pulling out hair, very unfortunate developments, but put that all aside. And now at some point, someone said, let's start this process over because we got to fix this bridge. On what authority was the highway administration relying when it said, fine, we're going to have this list of three mitigation, I think it was three mitigation things. And we're going to put it out there and say, react without talking to them first. First talking and then factoring that information in, not bound by it, but factoring that into your decision-making in formulating the initial proposal of mitigation efforts, the starting point of the discussion. Why... I'm asking you to explain to me why that isn't how it happened. I think what is driving this specific case is the fact that there was so much discussions prior to that... It's just a different thing. It ended up being something that just seemed very promising at the beginning and then Rhode Island pulled the legs out from under the table. But tell me, on the first programmatic agreement, did the highway administration consult with the tribe and maybe also with Rhode Island? Again, this is not to the exclusion of others, but to consult with the tribe before coming up with mitigation proposals, even as a the record doesn't indicate one way or the other. In the joint appendix, there is no evidence when the exact... I would have thought the highway administration would know what it did, but... Okay. All right. I think what's important, even assuming that there was an obligation to consult with the tribe before that initial proposal was made, the evidence clearly shows that the tribe was invited to provide input. It provided input. And actually, to those specific proposals that the tribe found were insulting, those did not end up in the final programmatic agreement. It's just a whole different thing when you start from a point of insult and then work from there, as opposed to start from a point of discussion and work from there. And the original... I thought the point of the statute was the latter. The point of the statute is to solicit the tribe's views. Exactly. Before the administration makes a decision. And a proposal is a decision. It's not locked in, but it's a decisional stage. And the unfortunate reality of this specific case is that there was a programmatic agreement in 2011 that everybody agreed to in that Rhode Island... I think we all know that history. That's not the question. I'm asking a legal question about your obligations. Nothing in the regulations. Nothing in your obligations in this case. Nothing in the regulations, nothing in this court's precedence requires the agency to engage with the tribe before putting forth a proposal that invites... Is there anything that says you don't have to? Or are you just telling me there's just a vacuum of information on this? It leaves it purposely vague to allow the agencies and the tribes and all interested parties to engage. It's purposely vague and you get to choose when you're going to start consulting. What's your best case for that? So the Eagle County, actually, in this from a couple of years ago from this court, actually specifically stated that there is... Doesn't the regulation say whenever an agency official proposes a programmatic agreement, the agency official shall ensure that development... Oh, development of the agreement includes appropriate government-to-government consultation. So it seems like you do have to consult before you propose the development of the agreement. It is in the development of the agreement, exactly. It is after there is a proposal that... Wait, a proposal isn't part of developing an agreement? Sorry, Your Honor? A proposal is not part of developing an agreement? I would have thought it would be maybe one of... I guess the starting point and the ending point would be the two most important ones. And that would be the beginning point. And that is when the consultations begin. That's when the tribe's views are solicited. The tribe's views here were solicited and they were listened to. And those initial proposals were rejected and they were not included in the ultimate programmatic agreement that was signed. And that is the Joint Appendix 396. That programmatic agreement, the 2019 programmatic agreement, provided that the three properties the tribe was most concerned with and that were subject to the 2019 programmatic agreement would be preserved by the state and they'll be managed by the state. And the tribe would be permitted access to those properties. I think my colleagues don't have... We haven't done good with our time with both of you. We keep keeping you up here longer than we promised. Do you have any more questions there? Okay. Thank you very much, counsel. Thank you. We ask that you affirm. Ms. Walker, we will give you two minutes. Oh. I'm going to refer you to the JA80, which is the handbook that HF puts together trying to help with the consultation process. Now, if you know the consultation process of the whole Historic Preservation Program, this handbook helps you. But they don't cite to code sections in the handbook. But on page eight, it says tribal consultation should commence early in the planning process in order to identify and discuss. This is all through the regulations they're recommending when they start consultation. This is on JA80. And it's a bullet. It's on page eight. Tribal consultation shall commence early in the planning process. So, again, I wish this were simple. But there's a lot of places where the tribe is important to consultation. And one is when they are starting an undertaking, and they're trying to identify if there's historic properties. They get the tribe. If it's going to be, if they believe there may be a tribal historic process, the tribe is to get in the process of consultation early with the agency. Then the tribe is in consultation when they decide, well, okay, the undertaking may impact, but does it have adverse impacts to the historic property? Tribe is supposed to be in that part early. And then when they also are supposed to be early, when the agency, the undertaking, they're looking at what the construction of the project would be. All of those stages, the tribe is to be in. Now, when it's on tribal reservation land, it's very easy to understand the tribe's going to have a primary role. But considering how little property Indians in this country have, how much they've lost, there's a lot of historic sites, Indian sites off reservation lands. When a tribe has a significant role in mitigating and negotiating those measures, that's when all the parties agree that there has to be mitigation of these adverse effects. Agency can come in and say, well, there's adverse, there's effects, but there are no harm, no harm done. But when they all agree, there is, sir. If we think of the planning process as ending when a final decision has been made, how long was the planning process here? Oh, well, this highway project, the first agreement was negotiated in 2013. The project had started 2011 when the consultation... I guess, sorry, I could have been more precise with the question. Yeah. If we think of the final decision as the second programmatic agreement, when did that, how long was that planning? Well, they terminated the first agreement, I think it was officially terminated in like January of that year. You're talking about 2018 or the end of June 20th, but that 19 when it was signed. So it was December is when that November is when things broke down, they terminated. So what happened in answer to Judge Millett's question is the tribe was, the state and the feds were consulting on what the mitigation measures would be, and then just presenting it to the tribe as if that were consultation. But in this role, where it was a programmatic agreement over a complex project, because they decided they had to go into subpart C of the act, because this was a bridge that had long impacted this property, it would cost too much to do all the excavation and evaluation of damages. So they had a very complex agreement, they went to the programmatic agreement. And in that stage, where they all agree, and I'll read it from, this is part of the the JA, this is on page 26 of this handbook, which is, let me see, JA 99-98. But it says, if an agreement has reached the agency and SHPO and consulting parties, including Indian tribes, to develop a section one memorandum agreement, or programmatic agreement outlining how the adverse effects will be addressed. And so what it goes to is that, this is on page 27, then that's when the tribe becomes a consulting party. So the tribe is not just being consulted, it is a negotiator in the mitigation agreements. You can't exclude them from that, that's not what the rules say. That's what happened here. I think there is some support in this regulation, 36 CFR section 800.14F, for Judge Millett's suggestion that maybe you have to consult before you propose. Oh yeah, absolutely. Consultation with Indian tribes and Native Hawaiian organizations when developing program alternatives, that's what it's called. Whenever an agency official proposes a program alternative, pursuant to Paragraphs A-B, the agency official shall ensure that development of the program alternative includes appropriate government-to-government consultation with affected Indian tribes and consultation. So that suggests that before it's proposed, when you're developing it, you have to consult. Exactly. That's what I'm trying to say, is that when they identify that they're going to, like here, expand this bridge project. But I guess the question is whether it's adequate, the whole prior discussion that they had, is that adequate to satisfy 800.14F? That was the consultation on the first programmatic agreement. The second programmatic agreement, when they reinitiated the 106 process. I think that's like a factual issue, like whether that can count, like everything you did with the first. Well, that's what the government wants to say, that they consulted and the tribe was a party. But that was the first agreement, not the second agreement. The second agreement was about the same bridge. Same bridge, and then expansion of the bridge in Providence. The original bridge was over this Covellands property that it caused all this, 30 million or something, they think it damages, and they were expanding it. So under Subpart B of the process, you have to do all this architectural review and evaluation, and the tribe's all part of that. But they didn't do it because they all knew the damage. About what year did the government, the agency, become aware that the land was special to the tribe, and the tribe would like other land kind of as well? Well, this bridge expansion project started in 2011, resulted in a programmatic agreement in 2013. Can you just please answer the question? That's when it started. What is the year when the agency?  In 2011, the agency was aware because the tribe told them, this land is special and we would like other land in exchange for it. Actually, the feds in the state came to the tribe with that proposal, which was agreed to by the state of Rhode Island, the tribe in Federal Highways. The tribe in the first programmatic... By 2011, the federal agency knew the land was special to the tribe, and the tribe would like other land as mitigation. Yeah, they offered that. So, since 2011 is well before the proposal for the second programmatic agreement, it seems to me that the government, the federal agency, consulted with the tribe well before the proposal for the second programmatic agreement. Yeah, but you can't collapse that. When they started the second, they terminated the first. When you terminate, then the agency has to re-initiate the Section 106 process, which re-initiates the consultation. So, they knew, and the tribe's not arguing. I'm not arguing with you that they didn't get consulted. Like, I mean, they continued to consult with the tribe after they proposed the second programmatic agreement. We all agree with that, correct? Yeah, because... And then the question is, did they need to consult with the tribe before the proposal for the second programmatic agreement? You say they did need to do that. Yes. And I think part of the government's argument is they did consult with the tribe before the second programmatic agreement's proposal because they had been consulting with the tribe since 2011. Yeah, but Judge Walker, this is the distinction I want to make, is the tribe was not a signatory or a party to the negotiation of those alternative measures for the second programmatic agreement. The first programmatic agreement, they were signatories and consulting parties because that's what the rules require, and the second... You're stating facts from the record that I know. I know, I know. And I don't even hear you arguing here that they, today, and that they needed to be a signatory to the second programmatic agreement. They did, that's what... You argued that in the brief, that they needed to be a signatory. Well, that's what I was trying to get to. But the question that we've been discussing is, regardless of whether they needed to be a signatory to the second programmatic agreement, had the tribe been consulted before the second programmatic agreement was proposed? And it seems to me they had been consulted for years before the second programmatic agreement. No, I disagree. And I'm not trying to be argumentative. I'm asking for your... No, I disagree. You can be argumentative. I know, but I'm not trying to be contrary, I guess is the word. But what I'm saying is where the tribe consistently complained was they weren't, because they weren't consulting parties, the state and the feds were deciding what the mitigation measures would be. And the tribe was complaining. That's not... We would never accept that. But they weren't brought in as a negotiator, as a party to execute the agreement. They were complaining before the second programmatic agreement was proposed? Yes, the records... They were complaining they would not accept what ended up being proposed? Yeah, they complained that they wouldn't accept it. That seems like the federal agency heard loud and clear from the tribe before the second... No, we're not saying they weren't giving the tribe information about what the state and the feds agreed to as mitigation measures. The difference is if you are a party brought in to be a negotiator on those, they can't sign off on that agreement if the tribe doesn't agree also. They all agreed on the first programmatic agreement. The state reneged and that was over. The second programmatic agreement, this is so important. That tribe was not a signatory for the second programmatic agreement. You say in your brief that the tribe had to be a signatory for the second programmatic agreement. I get that you think that's important and I get that that's an argument that's been briefed. But I think we've been talking for quite a while about a different legal issue, which is not about whether the tribe needed to be a signatory for the second programmatic agreement, but whether the tribe needed to be consulted before the proposal for the second programmatic agreement and whether they were consulted before the proposal for the second programmatic agreement and whether the discussion between the tribe and the agency during the first programmatic agreement would count as consultation with the tribe before the second programmatic agreement was proposed. Right?  Okay. My view, our view, I think the tribe's view would be the consultation had to start anew. The agency can't collapse the consultation before onto the second agreement. I think we should look at what the district court found. The district court found that the consultation was adequate and apparently it didn't rely on the consultations with respect to the first programmatic agreement because it starts the discussion by saying as early as June 28, 2018, the agency informed the tribe it was initiating a new programmatic agreement and then the tribe responds September 10, 2018, it was inadequate. When was the proposal actually made? Well, the proposal was between, they gave, they beat around the bush several different proposals. June 2018 was the proposal. Yeah, June 2018. That was the proposal. That was the final. According to the district court's findings, the district court found the consultations were adequate but didn't rely on prior consultations with respect to the first programmatic agreement. Well, I'm not disagreeing with what they found. District court didn't find any consultations with the tribe prior, once the first programmatic agreement was terminated before the June 2018, the tribe did not participate in the formulation of the June 2018 proposal.  That's factually accurate? That's accurate. And the district court did not rely on that? Yeah. Were they offered the opportunity to participate? No. We're only presented what the state and the feds agreed to as this is what we want to do. And the feds were talking first and then, okay. Yeah. I know, I don't want to keep repeating myself. No, no. I think we've been able to clarify it. But it is significant what the tribe is standing for and what the 33 other federally recognized tribes that filed an amicus on this brief are standing for. Yes, I think, sorry. We got their amicus brief. We have your brief. We are, they're standing for. I know, but they're standing for the fact they're required to be a signatory.  Yeah. Thank you. With that, the case is submitted. Thanks for the account.
judges: Millett; Walker; Pan